

FILED

AUG 2 6 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

IN THE MATTER OF THE SEARCH OF:   )
THREE SAMSUNG GALAXY          )   CASE NO. 3:22-MJ- 1177
CELLULAR TELEPHONES           )

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Ashley L. Scott, being duly sworn, state the following information to be true to the best of my knowledge, information and belief:

### INTRODUCTION

1.     I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so attached since May 2020, and currently work at the Knoxville District Office ("KDO"). As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.     Prior to my employment with the DEA, I was a DEA Task Force Officer through the Titusville Police Department in Titusville, Florida, where I was employed for 4 years. My experience includes, but is not limited to, conducting physical surveillance, interviewing witnesses, writing affidavits for and executing seizure warrants, working with undercover agents and informants, issuance of administrative and federal grand jury subpoenas, analysis of phone toll and financial records, and analysis derived from the use of pen registers, trap and traces, and wiretaps.

3.     I have received training and have experience in the investigation of violations of the federal drug and money-laundering laws. As a result, I am familiar with matters including the

means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers. In addition, I am also aware that it is common for members of DTOs to possess firearms in furtherance of their drug trafficking activities. In addition, it is also common to use electronic devices such as computers, cellular telephones, and other electronic means to communicate and store information relating to the DTO and the trafficking of drugs.

4. I am submitting this affidavit in support of an application for a warrant to search the following devices: black Samsung Galaxy with a clear case, IMEI: 357157889425267, described in Attachment A (hereinafter "TARGET DEVICE A"), black Samsung Galaxy with a blue and gray case, IMEI: 357815985558121, described in Attachment B (hereinafter "TARGET DEVICE B") and black Samsung Galaxy with no case, IMEI not displayed on phone, described in Attachment C (hereinafter "TARGET DEVICE C").

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C contain evidence of violations of Title 21, United States Code, Sections 846, and 841(a)(1), and Title 18, United States Code, Section 922, as further described in Attachment D.

## CONSPIRACY OVERVIEW

6. Since November 2021, a joint investigation with the DEA and Sevier County Street Crimes ("SCSC") unit has been investigating a crystal methamphetamine DTO that is based in

2

Sevier and Knox counties, which are located in the Eastern District of Tennessee ("EDTN"). Javier SANDEFER ("SANDEFER") has been identified as a member of this organization that obtained his supply of narcotics from the DTO leader identified as Jason FLENNIKEN ("FLENNIKEN"). SANDEFER was further identified in this investigation as a drug/money courier within the FLENNIKEN DTO, who travelled to Atlanta, Georgia to meet with FLENNIKEN's source of supply.

7. Additionally, during the same above time frame, SANDEFER contacted law enforcement with information regarding the FLENNIKEN DTO. At this time, SANDEFER expressed interest in cooperating with law enforcement and was signed up with SCSC as a confidential source. SANDEFER conducted recorded controlled purchases and provided actionable information to law enforcement that led to drug and money seizures from the FLENNIKEN DTO. SANDEFER provided accurate information to law enforcement that could be independently corroborated; however, in the course of the investigation, law enforcement learned that SANDEFER continued drug activities with FLENNIKEN and with FLENNIKEN's source of supply later identified as Jose Manuel MANZANAREZ HERNANDEZ ("MANZANAREZ HERNANDEZ") independent of FLENNIKEN, that was outside of the scope of his cooperation agreement and eventually lead to the termination of his cooperation agreement.

## **PROBABLE CAUSE**

8. On June 29, 2022, TFO Mashburn learned from a source that SANDEFER was at the Baymont Inn, Room 356, in Sevierville, Tennessee, with a large quantity of crystal methamphetamine. Based on this information and TFO Mashburn's previous relationship with SANDEFER as a confidential source, TFO Mashburn and members of SCSC conducted a knock and talk on Room 356, where they made contact with SANDEFER. SANDEFER was

3

Mirandized by TFO Mashburn. SANDEFER provided a verbal consent to search the room and SANDEFER's cellphone. The search of the room resulted in SCSC seizing approximately 1279.4 grams (gross weight) of crystal methamphetamine from inside of SANDEFER's room.

9. On June 30, 2022, investigators with the DEA debriefed SANDEFER. During this debrief, SANDEFER provided verbal and written consent to search the phone in his possession. SANDEFER stated MANZANAREZ HERNANDEZ contacted him via-Facebook messenger account "Darian HERNANDEZ" looking to conduct narcotics related business with SANDEFER independent from FLENNIKEN. SANDEFER stated he met MANZANAREZ HERNANDEZ at the 2701 Park Colony Drive in Norcross, Georgia, on June 26, 2022, where, according to SANDEFER, MANZANAREZ HERNANDEZ fronted him 3 kilograms of crystal methamphetamine at a wholesale value of $18,000.

10. While searching SANDEFER's phone, agents observed Facebook messenger communications between SANDEFER and MANZANAREZ HERNANDEZ starting on June 24, 2022, and continuing up until the day of debrief (June 30, 2022). The following is a portion of the conversation observed by agents, regarding the communication between MANZANAREZ HERNANDEZ and SANDEFER on June 26, 2022:

> MANZANAREZ HERNANDEZ – how many hours are you from Atlanta your friend
>
> SANDEFER – Almost 4 hours
>
> MANZANARE HERNANDEZ – Ok
>
> MANZANAREZ HERNANDEZ – if he takes 5, in how many days would he return friend? That's more expensive, but he can lend me 5, but I want to make sure how many days it would take to tell him
>
> SANDEFER – I'd like to say 3-5 days. I feel like my people move through plenty.
>
> SANDEFER – ice right? Or powder?

4

MANZANAREZ HERNANDEZ – ice friend

MANZANAREZ HERNANDEZ – friend I only have 3 kilos of ice if you want to come now

MANZANAREZ HERNANDEZ – the coca was canceled friend I don't know if you want the ice let me know if it can come and let me know the time it will arrive friend.

MANZANAREZ HERNANDEZ – sorry for the delay but they are scarce and they are going to upload them friend.

11.    Based on my training and experience in the above messages, MANZANAREZ HERNANDEZ was describing to SANDEFER the type and quantity of narcotics that MANZANAREZ HERNANDEZ could obtain to sell to SANDEFER. MANZANAREZ HERNANDEZ uses the street terms "ice," which is commonly used for crystal methamphetamine, and "coke," which is commonly used for cocaine. MANZANAREZ HERNANDEZ told SANDEFER he only has "3 kilos". "Kilos" is a commonly used street term for kilograms.

12.    Prior to the above incident, SANDEFER was signed up as a confidential source by SCSC. SANDEFER made the above trip without the permission of law enforcement and in violation of his SCSC confidential source agreement. Following this incident, SANDEFER was terminated as a confidential source.

13.    On July 11, 2022, TFO Mashburn made contact with SANDEFER for the purpose of obtaining SANDEFER's consent to utilize SANDEFER's Facebook account to communicate directly with MANZANAREZ HERNANDEZ. SANDEFER provided investigators with both written and verbal consent to utilize the Facebook account in an undercover (UC) capacity.

5

SANDEFER provided investigators with the login username and password to access the account for a period of thirty days.

14.     On July 13, 2022, at approximately 2:34 p.m., SA Scott, posing as SANDEFER sent the first UC message to MANZANAREZ HERNANDEZ via Facebook account "Darian Hernandez". Below is a summary and not verbatim of the conversation between SA Scott and MANZANAREZ HERNANDEZ.

        a.      SA Scott initiated the conversation and informed MANZANAREZ-HERNANDEZ of having the debt (referring to the $18,000 owed to MANZANAREZ-HERNANDEZ for the 3 kilograms that he fronted to SANDEFER) and an additional $10,000 to get "work", which is a code utilized in previous conversation for narcotics. SA Scott further confirms the transaction by stating, "Same as last time on ice or can I get more?".

        b.      MANZANAREZ HERNANDEZ to SA Scott – "Im going to see what price they leave me for 10 kilos friend".

        c.      MANZANAREZ HERNANDEZ tells SA Scott to let him know the day before coming.

15.     On July 15, 2022, at approximately 4:22 p.m., SA Scott sent a message to MANZANAREZ HERNANDEZ, via Facebook account "Darian Hernandez". Below is a summary and not verbatim of the conversation between SA Scott and MANZANAREZ HERNANDEZ:

        a.      SA Scott provided MANZANAREZ-HERNANDEZ with telephone number 865-685-9497, to further their communication. The above is an undercover (UC) telephone number utilized by SA Scott.

6

b.    MANZANAREZ HERNANDEZ sent SA Scott a text from telephone number 615-985-3153, to SA Scott's UC telephone number. In the message sent from MANZANAREZ HERNANDEZ, he sent a copy and paste of the UC telephone number and message sent to him by SA Scott from Facebook messenger. SA Scott responded, "Is this you friend?" and MANZANAREZ HERNANDEZ responded "Yes friend I am Jose".

16.    A query was conducted on the above telephone number utilized by MANZANAREZ HERNANDEZ in WhatsApp. Displayed was a profile photo image of MANZANAREZ HERNANDEZ.

17.    SA Scott maintained communications with MANZANAREZ HERNANDEZ via-text message for several days. During these conversations, SA Scott negotiated the narcotics transaction, reassured MANZANAREZ HERNANDEZ of having the money to include sending MANZANAREZ HERNANDEZ a staged photograph of a DEA KDO member's hand holding approximately $20,000 official advanced funds (OAF), providing various excuses to stall the transaction and other communication not pertinent to the investigation.

18.    On July 19, 2022, United States Magistrate Judge Catherine M. Salinas of the Northern District of Georgia signed a federal search warrant[1] for 2701 Park Colony Drive in Norcross, Georgia, which is a one bedroom/one bathroom residence.

19.    On July 20, 2022, SA Scott text messaged MANZANAREZ HERNANDEZ confirming that she would be arriving on Thursday at 7 a.m. (July 21, 2022) and to confirm MANZANAREZ HERNANDEZ would be ready with the narcotics. MANZANAREZ HERNANDEZ response to SA Scott was "Yes friend I'm ready". MANZANAREZ

---

[1] Reference Case No. 1:22-MC-1305.

7

HERNANDEZ further stated, "if you like to arrive at 6 am it would also be good friend". Before ending the conversation, MANZANAREZ HERNANDEZ cautioned SA Scott to be careful.

20.     On July 21, 2022, at approximately 3:47 a.m., SA Scott text messaged MANZANAREZ HERNANDEZ that she was 3 hours way. Below is a summary and not verbatim of the remaining conversation between SA Scott and MANZANAREZ HERNANDEZ:

     a.     MANZANAREZ HERNADEZ to SA Scott at approx. 3:49 a.m.- "okay friend careful friend".

     b.     SA Scott to MANZANAREZ HERNANDEZ at approximately 6:13 a.m. – "About 20 minutes out my friend. Do you want me to come to the same place before?"

     c.     MANZANAREZ HERNANDEZ to SA Scott at approximately 6:15 a.m. – "yes to the same place friend".

     d.     SA Scott to MANZANAREZ HERNANDEZ at approximately 6:16 a.m. – "Okay Ill let you know when I get there".

21.     On July 21, 2022, at approximately 6:33 a.m., agents with the DEA KDO and DEA OCDETF Strike Force Group 1 (Atlanta) executed the above search warrant. As agents were approaching the door, MANZANAREZ HERNANDEZ was opening the front door possible attempting to exit the residence. Upon seeing the agents, MANZANAREZ HERNANDEZ took off a short distance back inside of the residence and then dropped to the ground. Agents searched MANZANAREZ HERNANDEZ person and found TARGET DEVICE A, TARGET DEVICE B, and a wad of US currency in MANZANAREZ HERNANDEZ's pocket.   MANZANAREZ HERNANDEZ was detained and was told by agents the reason for searching the residence. At this time MANZANAREZ HERNANDEZ told agents that the narcotics were in the bedroom.

8

22.     A search of the bedroom revealed 11-pint sized paint cans in a black garbage bag underneath the bed. Inside each can was approximately half a kilogram of suspected crystal methamphetamine, which later field tested presumptive positive for the presence of methamphetamine. A plastic container containing approximately 1 kilogram of suspected crystal methamphetamine was found underneath the pillow on the bed. The suspected crystal methamphetamine in the plastic container also field tested presumptive positive for the presence of methamphetamine. In total, agents seized approximately six and a half kilograms of suspected crystal methamphetamine from the residence. Additionally, agents seized TARGET DEVICE C from the bedroom. A scale was also found and photographed inside the residence. After the search, MANZANAREZ HERNANDEZ was arrested and transported back to the EDTN for prosecution.

23.     Based on my training and experience as well as information from this investigation, I believe MANZANAREZ HERNANDEZ utilized TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C in the furtherance of the distribution of crystal methamphetamine in the Eastern District of Tennessee. Furthermore, it is common for individuals to maintain phone numbers, contacts, messages, images and other electronic data in regard to their activities as it pertains to the sell/purchase of narcotics. Therefore, I believe the cellular telephones (TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C) seized from MANZANAREZ HERNANDEZ and the residence will maintain valuable evidence pertinent to the narcotics that were in his possession.

## Technical Terms

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.     Wireless Telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

25.     Based on my training, experience, and research, I know that cellular devices such as the TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C, may have capabilities that frequently include acting as a wireless telephone and external hard drives.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of a crime, or point

10

toward the existence of evidence in other locations. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

### Electronic Storage and Forensic Analysis

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.     *Forensic evidence.* As further described in Attachment D, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the particular TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the particular TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C because:

        a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

11

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.      The nature of cellular phone-related evidence requires forensic analysts to employ a variety of different techniques to search for, document, and obtain electronic evidence. The search procedure may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

               i. examination of all of the data contained in the cellular telephone, and/or memory storage devices in the cellular telephone to view the data and

12

determine whether that data falls within the items to be seized as set forth herein;

ii. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

iii. surveying various file directories and the individual files they contain;

iv. opening files in order to determine their contents;

v. scanning storage areas; and

vi. performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear.

28.     Because this warrant seeks only permission to examine only TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.     In light of the foregoing, there is probable cause to search TARGET DEVICE A, TARGET DEVICE B, and TARGET DEVICE C as set forth in Attachments A, B, C and D for evidence of drug trafficking in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Respectfully submitted,

13

Ashley L. Scott,
DEA Special Agent

Subscribed and sworn to before me on this 16th day of August, 2022.

DEBRA C. POPLIN
United States Magistrate Judge

14